**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG DIVISION**

**MICHAEL FELLOWS,**

       **Plaintiff,**

**v.**                            **Civil Action No. 1:12-cv-78**
                                        **JUDGE KEELEY**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

       **Defendant.**

**REPORT AND RECOMMENDATION RECOMMENDING THAT THE DISTRICT**
**COURT DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [11],**
**GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[12],**
**AND AFFIRM THE DECISION OF THE COMMISSIONER**

## I.    INTRODUCTION

On May 11, 2012, Plaintiff Michael Fellows ("Plaintiff"), by counsel David E. Furrer, Esq.,

filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Michael

J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section

205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1.)  On

July 17, 2012, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States

Attorney, filed an answer and the administrative record of the proceedings.  (Answer, ECF No. 6;

Administrative Record, ECF No. 7.)  On August 10, 2012, and, Plaintiff and the Commissioner filed

their respective Motions for Summary Judgment.  (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No.

11; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 12.)  Following review of the motions by

the parties and the administrative record, the undersigned Magistrate Judge now issues this Report

and Recommendation to the District Judge.

## II.    BACKGROUND

## A.    *Procedural History*

On June 22, 2009,[1]  Plaintiff protectively filed a Title II claim for disability insurance benefits ("DIB"), alleging disability that began on March 23, 2008.  (R. at 96-99.)  His claim was initially denied on an unknown date and again upon reconsideration on an unknown date.  (R. at 40-47.)  Plaintiff filed a request for a hearing (R. at 49), which was held before United States Administrative Law Judge ("ALJ") Kathleen Scully-Hayes on December 2, 2011 (R. at 20, 51-55.)  Plaintiff, represented by David Furrer, Esquire, appeared and testified in Hagerstown, Maryland, while the ALJ presided over the hearing from Baltimore, Maryland.  (R. at 15, 20.)  Martin Kranitz, an impartial vocational expert, appeared but did not testify.  (*Id.*; *see also* R. at 68.)  On December 9, 2011, the ALJ issued a favorable decision to Plaintiff, finding that he was disabled within the meaning of the Social Security Act ("Act").  (R. at 15-19.)  On April 13, 2012, the Appeals Council issued a partially favorable decision, finding that Plaintiff was not disabled prior to March 27, 2009 but became disabled beginning March 27, 2009.  (R. at 5-8.)  Plaintiff now requests judicial review of the Appeals Council's decision finding him not disabled prior to March 27, 2009.

## B.    *Personal History*

Plaintiff was born on February 16, 1954 and was 55 years old when he filed his DIB application.  (R. at 96.)  He completed high school in 1972.  (R. at 120.)  Plaintiff has prior work experience as a manager and salesman of automotive parts.  (R. at 116, 123-30.)  Plaintiff is married to Shirley A. Fellows and has no dependent children.  (R. at 96-97.)

---

[1] Plaintiff's application, contained as Exhibit 1D in the Administrative Record, refers to a date of July 7, 2009.  (R. at 96.)  However, the Disability Determination and Transmittal sheets included in the Administrative Record as Exhibits 1A, 2A, and 3A list a filing date of June 22, 2009.  (R. at 37-39.)

## C.    *Relevant Medical History*

Plaintiff presented with confusion and an inability to walk because of a large abscess on his left lower leg at the Winchester Medical Center on March 23, 2008.  (R. at 368.)  According to Plaintiff's family, he had been hallucinating, running fevers, and appearing disoriented.  (*Id.*)  An examination revealed that Plaintiff's abscess was cellulitic with skin breakdown.  (*Id.*)  Dr. Douglas Benkelman assessed an abscess and cellulitis of the left lower extremity; new onset diabetes; acute dehydration; acute electrolyte abnormality; and evaluation of acute mental status changes secondary to sepsis and dehydration.  (R. at 369.)  Plaintiff was transferred to the operating room for incision and drainage.  (*Id.*)

The next day, Plaintiff was back at the Winchester Medical Center with complaints of confusion and an inability to walk on his left leg.  (R. at 296.)  Dr. Elizabeth Cressy, who completed a physical of Plaintiff, assessed cellulitis and abscess in Plaintiff's left calf; new-onset diabetes; hyponatremia; leukocytosis; and altered mental state.  (R. at 297-98.) Consulting physician Dr. Paul Lambert noted that Plaintiff's underlying muscles were granulating well and that there was no exposed bone.  (R. at 302.)  The area distal to Plaintiff's knee was showing good granulation tissue, but the area proximal to his knee had neither granulation tissue nor fibrinous exudate.  (*Id.*)

Plaintiff underwent three procedures during his stay at Winchester Medical Center.  On March 24, 2008, Dr. Troy Glembot completed an incision and drainage with fascial and muscle debridement on Plaintiff's left lower leg.  (R. at 312.)  Dr. Glembot's preoperative diagnosis was left lower extremity cellulitis; however, his post-operative diagnosis was left lower extremity necrotizing fasciitis with minor necrosis.  (*Id.*)  He noted that Plaintiff was in stable condition with no complications after the procedure.  (R. at 313.)  A day later, Dr. Glembot performed a removal,

debridement, and washout of Plaintiff's lower left leg with an application of a wound VAC. (R. at 314.) His post-operative diagnosis was of necrotizing fasciitis with myonecrosis. (*Id.*) Dr. Glembot noted that Plaintiff tolerated the procedure well. (*Id.*) On March 27, 2008, Dr. Glembot removed Plaintiff's wound VAC, performed a full-thickness skin debridement around Plaintiff's patella and popliteal fossa, performed a debridement of Plaintiff's fascia, and reapplied the wound VAC. (R. at 316.) He noted that Plaintiff tolerated the procedure well. (*Id.*) Plaintiff was discharged on March 28, 2008. (R. at 299-300.) Dr. Menbere Bahru diagnosed him with left lower extremity necrotizing fasciitis status post surgical debridement among other diagnoses. (R. at 299.) Plaintiff was discharged to a nursing home for continuing IV antibiotics and physical therapy. (R. at 300.)

On May 8, 2008, doctors at the Catoctin Medical Group in Frederick, Maryland, saw Plaintiff for hypertension and type 2 diabetes. (R. at 393.) That day, they noted that Plaintiff was adequately controlling his hypertension. (R. at 392.) This was noted again on May 28, 2008. (R. at 414.) On June 8, 2009, doctors again noted Plaintiff's hypertension and stated that he had it under "adequate, though not ideal control." (R. at 388.)

Plaintiff was admitted to the Winchester Medical Center on July 5, 2008 after complaining of erythema in his left leg. (R. at 435.) An ultrasound of his leg was negative for DVT but revealed subcutaneous edema. (*Id.*) Dr. Shannon Dodd recommended that Plaintiff wear a compression stocking and follow-up with the wound care clinic in one to two weeks. (*Id.*) Dr. Ashkan Jafarbay assessed possible cellulitis; acute renal insufficiency; hypertension; and diabetes mellitus. (R. at 275.) Dr. Sean O'Mara noted that Plaintiff's left lower leg was "significant for both areas of fasciotomies with skin grafting that appears well healed." (R. at 286.) Plaintiff was discharged on July 6, 2008. (*Id.*)

Plaintiff began seeing Dr. John Carter of Retina Associates on March 27, 2009. (R. at 212.) Dr. Carter noted that Plaintiff had neovascularization in both eyes and macular edema, "more in the right eye than the left." (*Id.*) Dr. Carter stated that Plaintiff was "at risk of losing vision in both eyes. This is advanced diabetic retinopathy." (*Id.*) On April 9 and 16, 2009, Plaintiff underwent laser surgery in his left and right eyes. (R. at 214-15.) Dr. Carter noted that Plaintiff tolerated these procedures well. (*Id.*)

Plaintiff underwent a pars plana vitrectomy with dissection of epiretinal membranes, pan retinal photocoagulation of his right eye on May 26, 2009. (R. at 433.) An examination before surgery revealed that Plaintiff had 20/80 visual acuity in both eyes without correction. (R. at 430.) Dr. John Carter noted that Plaintiff had a "vitreous hemorrhage" and a "traction retinal detachment along the superotemporal arcade with the area of elevated retina extending inferiorly from the superotemporal arcade approximately halfway to the fovea." (*Id.*) Dr. Carter noted that Plaintiff was taken to the recovery room in satisfactory condition after the procedure. (R. at 433.) He diagnosed traction retinal detachment, right eye, and Plaintiff was discharged home the same day with instructions to keep a patch and shield over his right eye and take Tylenol for pain. (R. at 432.) That same day, Dr. Carter noted that Plaintiff was "doing well." (R. at 220.)

Plaintiff underwent an injection of Avastin in his left eye on June 11, 2009. (R. at 483.) Dr. John Carter noted that the reason for the injection was Plaintiff's "diabetic macular edema OS." (*Id.*) Dr. Carter also noted that Plaintiff tolerated this procedure well. (*Id.*)

Dr. Carter diagnosed Plaintiff with traction retinal detachment, left eye on June 16, 2009, and Plaintiff underwent a pars plana vitrectomy with dissection of epiretinal membranes and panretinal photocoagulation on his left eye that same day. (R. at 421.) An examination before the procedure

revealed that Plaintiff had 20/400 visual acuity in his left eye without correction. (R. at 416.) Dr. Carter noted proliferative disease along both arcades and "mild nuclear sclerosis on dilated ophthalmology of the left eye." (*Id.*) After the procedure, Plaintiff was taken to the recovery room in satisfactory condition. (R. at 421.) He was discharged home that same day with instructions to keep a patch and shield over his left eye. (R. at 420.)

Staff at Retina Associates completed a Routine Abstract Form–Physical on July 14, 2009. (R. at 238-42.) They noted that Plaintiff suffered from diabetic macular edema and bilateral tractional retinal detachments. (R. at 238.) At that time, Plaintiff's best corrected visual acuity was 20/80 in his right eye and 4/200 in his left eye. (R. at 239.)

On August 31, 2009, James Dolly, O.D., conducted a consultative examination of Plaintiff. (R. at 396-98.) He noted that Plaintiff's "visual field in the right eye is constricted 360° around, but least of all in the temporal range." (R. at 396.) However, Plaintiff had a normal right physiologic blind. (*Id.*) Dr. Dolly also noted that Plaintiff's "visual field in the left eye is constricted in all ranges as well as in the superior and nasal quadrants." (*Id.*) His left physiologic blind spot was normal in size but had shifted downward. (*Id.*) Overall, Dr. Dolly noted that Plaintiff's "visual field plots are consistent with the patient's history of retinal problems and treatment." (*Id.*)

Dr. Curtis Withrow completed a Physical Residual Functional Capacity Evaluation of Plaintiff on September 3, 2009. (R. at 437-44.) He found that Plaintiff could occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand, walk, and sit for six hours in an eight-hour workday; and was unlimited in pushing and pulling. (R. at 438.) Dr. Withrow determined that Plaintiff could never climb ladders, ropes, or scaffolds; but that he could occasionally climb ramps and stairs, balance, and crawl. (R. at 439.) Plaintiff could also frequently

stoop, kneel, and crouch. (*Id.*) Dr. Withrow noted that Plaintiff had visual limitations with his near acuity, far acuity, depth perception, accommodation, and field of vision; however, he also noted that despite evidence of significant visual impairment, Plaintiff did not meet a listing. (R. at 440.) He determined that Plaintiff should avoid moderate exposure to hazards and concentrated exposure to extreme cold and heat, vibrations, and fumes, dusts, gases, and odors. (R. at 441.) Dr. Withrow also noted that Plaintiff was mostly credible in his allegations. (R. at 442.) Five days later, Dr. Withrow submitted a case analysis stating that there was no mention of Plaintiff having a visual abnormality prior to March 27, 2009. (R. at 445.) He stated that it was reasonable to consider that Plaintiff had significant restrictions on his vision for eight months prior to that time, and that a limitation to light work should be considered for the period form March 23, 2008 to July 2008. (*Id.*) Dr. Nisha Singh agreed with Dr. Withrow's assessment on September 18, 2009. (R. at 452-53.)

Plaintiff saw Dr. John Carter again on November 9, 2009 for a follow-up appointment for his "background and proliferative diabetic retinopathy." (R. at 482.) Dr. Carter noted that Plaintiff had macular edema with a "fine epiretinal membrane" that appeared "relatively immature." (*Id.*) He determined that Plaintiff's left eye did not have macular edema, but noted "ischemic enlargement of the foveal avascular tone." (*Id.*) Dr. Carter decided to make arrangements for focal laser surgery on Plaintiff's right eye, but decided to leave the left eye alone for now. (*Id.*) Three days later, Plaintiff underwent focal laser surgery on his right eye. (R. at 481.) Dr. Carter noted that he tolerated the procedure well. (*Id.*)

Dr. Dolly completed another consultative examination of Plaintiff on November 10, 2009. (R. at 456-57.) He noted that Plaintiff had "significant abnormalities in the macular area of both eyes." (R. at 456.) Without correction, Plaintiff distance visual acuity in his right eye was 20/70+,

and 20/400 in his left eye. (*Id.*) With correction, his distance visual acuity in his right eye was 20/60, and 20/400 in his left eye. (*Id.*) Without correction, Plaintiff's near visual acuity in his right eye was 20/60, and 20/400 in his left. (*Id.*) These values did not change for Plaintiff's near visual acuity with correction. (*Id.*) Dr. Dolly diagnosed legally blind OS; advanced diabetic retinopathy OU; continuing diabetic retinal changes in spite of treatment; and constricted visual fields OU. (R. at 457.) He opined that Plaintiff's "prognosis for saving the vision he presently has is guarded at best" because his "diabetic retinopathy is troubling in that it continues to progress is [sic] spite of treatment." (*Id.*) On December 9, 2009, Dr. Withrow noted that this eye examination did not document a significant change since Plaintiff's exam on June 16, 2009. (R. at 458.) Furthermore, Dr. Withrow stated that this examination did not change Plaintiff's residual functional capacity from September 3, 2009. (*Id.*)

On February 2, 2010, Dr. Lawrence Schaffzin reviewed Plaintiff's physical residual functional capacity assessment. (R. at 473-74.) He disagreed with Plaintiff's postural and visual limitations. (R. at 473.) Specifically, Dr. Schaffzin noted that Plaintiff's condition was moderately severe and that he should never climb ladders, ropes, or scaffolds and should avoid moderate exposure to hazards. (R. at 472.) Furthermore, he stated that Plaintiff "would be able to handle and work with medium to large objects and avoid ordinary hazards in the average workplace." (*Id.*)

Dr. Robert Webb completed a consultative examination of Plaintiff on July 28, 2010. (R. at 497-99.) At this examination, Plaintiff stated that he had already undergone two laser therapy treatments on each eye and that he has been told nothing further can be done for his left eye. (R. at 497.) He complained that he has difficulty judging distance, going down hills, climbing up stairs, and that he has repeatedly fallen because of his vision problem. (*Id.*) However, Plaintiff reported

that despite his left leg at times becoming sore and stiff, he walks about a mile per day "without undue problems." (*Id.*)  Dr. Webb noted that Plaintiff's vision in both eye was 20/800, 20/800 in his right eye, and that he could not see the figures on the chart with his left eye.  (R. at 498.)  He also stated that Plaintiff's fundi "showed bilateral scarring from his laser treatment" and that the right fundus looked worse than the left, but that the left disk looked atrophic.  (*Id.*)  Dr. Webb saw Plaintiff's right retina better than the left.  (*Id.*)  During the examination, Plaintiff displayed a stable gait, and he held his stance despite some swaying with Romberg testing.  (R. at 499.)  Dr. Webb's impressions were of history of acute brown recluse spider bite, left leg with extensive skin necrosis and muscle damage; acute diabetes mellitus leading to marked vision problems and significant vision loss; hypertension; and left shoulder discomfort and stiffness, possible rotator cuff problems. (*Id.*)

Dr. Fulvio Franyutti completed a Physical Residual Functional Capacity Assessment of Plaintiff on August 2, 2010.  (R. at 500-07.)  He agreed with Dr. Withrow regarding Plaintiff's exertional limitations.  (R. at 501.)  He noted that Plaintiff could never climb ladders, ropes or scaffolds; but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (R. at 502.)  Dr. Franyutti determined that Plaintiff was limited visually in his far acuity, depth perception, and field of vision because of his monocular vision.  (R. at 503.)  He noted that Plaintiff needed to avoid moderate exposure to hazards, and concentrated exposure to extreme cold, extreme heat, and vibrations.  (R. at 504.)

On September 16, 2010, Dr. Carter referred Plaintiff to Dr. Tayyib Rana for consideration of cataract surgery on his left eye.  (R. at 526.)  In this letter, Dr. Carter noted that Plaintiff, at that time, had macular edema in his right eye but not the left.  (*Id.*)  He also stated that Plaintiff did not

have any active neovascularization, and that he had planned a series of three monthly injections of Avastin for Plaintiff's right eye. (*Id.*) Plaintiff underwent an Avastin injection on September 30, 2010. (R. at 533.) Dr. Carter noted that he tolerated the procedure well. (*Id.*) Plaintiff underwent two more injections on October 28, 2010 and December 9, 2010. (R. at 531-32.) He tolerated these procedures well. (*Id.*) On February 9, 2011, in another letter to Dr. Tayyib Rana, Dr. Carter noted that Plaintiff's Avastin treatment had been disappointing and that this was "most likely related to an epiretinal membrane" in the eye. (R. at 525.) Dr. Carter discussed vitrectomy with Plaintiff to remove the membrane; however, Plaintiff at that time preferred to "leave things alone." (*Id.*)

On August 2, 2011, Dr. Carter completed a vision impairment residual functional capacity assessment of Plaintiff. (R. at 522-24.) He noted that Plaintiff has decreased vision in both eyes and that he would have difficulty reading all but the largest print in a competitive work situation. (R. at 522.) He opined that Plaintiff could never complete work activities involving near acuity and accommodation, and that Plaintiff had poor far acuity, depth perception, and color vision. (R. at 523.) Dr. Carter determined that Plaintiff was capable of avoiding ordinary hazards in the workplace, and that he could work with large but not small objects. (*Id.*) Overall, Dr. Carter believed that Plaintiff's condition would frequently interfere with his attention and concentration to perform even simple tasks. (R. at 524.)

Plaintiff saw Dr. Carter again on November 14, 2011 for a follow-up for his diabetic retinopathy. (R. at 539.) He noted that Plaintiff has an epiretinal membrane in his right eye and that his left eye has chronic ischemic changes. (*Id.*) Dr. Carter discussed a vitrectomy procedure to remove the membrane from the right eye, but Plaintiff indicated that he wished to "leave things alone." (*Id.*)

### D.   *Testimonial Evidence*

At the hearing before the ALJ, Plaintiff testified that he does not receive any governmental assistance and that he relies on his wife's salary.  (R. at 26.)  He has a driver's license, but does not drive because he is not allowed to.  (*Id.*)  Plaintiff last worked in 2007 when he worked for Napa Auto Parts in Inwood, West Virginia.  (R. at 26-27.)  He left there after about one year when he was let go after the company was bought out by another company.  (R. at 27.)  Before that, Plaintiff worked for another automotive parts store in Frederick, Maryland from 1979 until 2006.  (*Id.*)  He stopped working there because he no longer wanted to commute to Frederick and because he wanted to work closer to home.  (*Id.*)

Plaintiff testified that he can only see the equivalent of the largest print on a newspaper and that he cannot see people's faces.  (R. at 28.)  He noted that in 2008, he was bitten by a poisonous spider and almost lost his left leg.  (*Id.*)  He stated that he can "get around pretty good with that leg now" and that he experiences some pain once in a while, but that was to be expected.  (R. at 33.)  A few months later, he discovered that the steroids and stimulants he had been taking to help his leg muscles regrow caused his blood sugar to rise to the point where the blood vessels in his eyes would rupture and blood would accumulate in his eyes.  (R. at 28.)  Plaintiff noted that he has had several surgeries to try to correct his vision, but that the blood vessels have still become scar tissue that affects the screen in the back of his eye.  (R. at 28-29.)

At the hearing, Plaintiff stated that he experiences light sensitivity.  (R. at 30.)  He cannot go into a darkened room, and he cannot stand really bright lights.  (*Id.*)  He also testified that he can barely decipher the outlines of people's faces and that they are "like a shadow."  (*Id.*)  Plaintiff noted that walking is a significant problem for him because his equilibrium is a bit off because of his

vision. (R. at 31.) He stated that his wife normally has to walk with him because he cannot judge curbs and sometimes will trip over small sign posts and other objects. (*Id.*) When asked, Plaintiff described some episodes of dizziness once in a while, but that he "just kind of let that pass." (*Id.*) Plaintiff testified that his left eye is totally blind, and that according to his doctor, Dr. Carter, his right eye is getting worse. (R. at 32.) He noted that he can only see the "E" at the very top of a vision chart. (*Id.*) Besides his vision loss, Plaintiff suffers from high blood pressure, and he takes four medications to control that. (R. at 30, 31.)

## E. Vocational Evidence

No vocational testimony was taken at the hearing before the ALJ because the ALJ stated she did not believe she needed any, and Mr. Pure, Plaintiff's attorney at the hearing, agreed. (R. at 35.) A Report of Contact Form dated January 7, 2010 notes that Plaintiff could return to his past work as a salesperson as it is described in the national economy. (R. at 152.) Another Report of Contact form agreed with this assessment on August 9, 2010. (R. at 185.)

## F. Lifestyle Evidence

In an Adult Function Report dated July 12, 2009, Plaintiff reported that he spends his days making breakfast, doing yard work, cleaning the house, making dinner, and babysitting his granddaughter. (R. at 131.) He takes care of a dog by feeding it and taking it for walks; however, his wife, daughter, and son help him with this and also with house and yard work. (R. at 132.) Plaintiff reported that he has no issues with personal care. (*Id.*)

Plaintiff prepares simple meals such as hot dogs, hamburgers, and eggs, and he does this daily. (R. at 134.) He spends six to eight hours daily cleaning the house, doing yard work, doing laundry, and preparing meals. (*Id.*) However, he needs help because he is unable to read measuring

cups, directions on boxes, and stove settings. (*Id.*) Plaintiff goes outside daily, but cannot drive a car because of his vision impairment. (R. at 135.) He goes shopping once a week for about two hours for groceries and household needs. (*Id.*) Plaintiff reported that he cannot pay bills, count change, handle a savings account, or use a checkbook or money orders because he needs help to read bills or see any money. (*Id.*)

Plaintiff reported that he enjoys building cars and working on cars; however, he never does this anymore because he cannot see nuts, bolts, or sizes on wrenches. (R. at 136.) He spends time with others by visiting relatives and friends weekly. (*Id.*) Plaintiff also goes to stores and the community center on a regular basis. (*Id.*) He cannot read or watch television because of his condition. (R. at 137.)

In another Adult Function Report dated April 29, 2010, Plaintiff stated that he spends his days trying to cook and clean. (R. at 168.) He reported that he does not take care of any pets because his son does that. (*Id.*) In this form, Plaintiff noted that his conditions affected his ability to shave, care for his hair, and dress because of his vision. (*Id.*) He also no longer prepares meals, but noted that he uses a microwave with help in reading directions. (R. at 169.) Plaintiff spends about one to two hours doing laundry and vacuuming, and he has to be told not to give up. (*Id.*) He does not do yard work because anything with sharp edges is hazardous to him. (R. at 170.)

Plaintiff goes outside daily, but has to be careful of the stairs. (R. at 170.) He reported that he shops once a week for food and clothes with help. (*Id.*) In this report, Plaintiff noted that he can pay bills, but that it is difficult for him to see small writing or computer screens. (*Id.*) He also reported going to the park by his house once a week to socialize. (R. at 171.)

### III.   CONTENTIONS OF THE PARTIES

Plaintiff, in his motion for summary judgment, asserts that he is entitled to judgment as a matter of law because there is no genuine issue of material fact. (Pl.'s Mot.) Specifically, Plaintiff asserts that the Appeals Council's decision is erroneous because:

- It is contrary to the medical record because the medical records themselves establish that Plaintiff suffered from a visual impairment prior to March 27, 2009; and

- It is based upon an erroneous conclusion that the sole ground upon which the ALJ found Plaintiff disabled was his visual impairment.

(Pl.'s Mem. Supp. Mot. for Summ. J. ("Pl.'s Br."), ECF No. 11-1 at 7-11.)

The Commissioner, in his motion for summary judgment, asserts that the ALJ's decision "is supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot.) Specifically, the Commissioner alleges that:

- Substantial evidence supports the Appeals Council's decision that Plaintiff became disabled no earlier than March 27, 2009;

- The Appeals Council correctly found that the Plaintiff's period of disability began on March 27, 2009 rather than March 23, 2008; and

- That Plaintiff cannot meet the duration requirements of 20 C.F.R. § 404.1509 to establish an onset date of March 23, 2008.

(Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s Br."), ECF No. 13 at 2-12.)

### IV.   STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied. *See* 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. *See Laws v. Celebrezze*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962).

*Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit has defined substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws,* 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** *Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V.   ANALYSIS

### A.    Standard for Disability and the Five-Step Evaluation Process

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-

step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. §§ 404.1520, 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920 (2011). If the claimant is determined to be disabled or not disabled

at any of the five steps, the process does not proceed to the next step. *Id.*

**B.** **_Discussion of the Administrative Law Judge's Decision_**

Utilizing the five-step sequential evaluation process outlined above, the ALJ made the following findings:

1.     **The claimant's date last insured is December 31, 2019.**

2.     **The claimant has not engaged in substantial gainful activity since March 23, 2008, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).**

3.     **The claimant has the following severe impairments: Vision Loss and Hypertension (20 CFR 404.1520(c)).**

4.     **The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).**

5.     **The claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant can perform only occasional climbing, balancing, stooping, and due to lack of vision in right eye and vision loss in the left eye, the claimant must avoid hazards including heights and moving machinery.**

6.     **The claimant is unable to perform any past relevant work (20 CFR 404.1565).**

7.     **The claimant was an individual closely approaching advanced age on the established disability onset date (20 CFR 404.1563).**

8.     **The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).**

9.     **The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity defined above (20 CFR 404.1568).**

10.     **Considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).**

11.     **The claimant has been under a disability as defined in the Social Security Act since March 23, 2008, the alleged onset date of disability (20 CFR 404.1520(g)).**

(R. at 17-19.)

## C. Discussion of the Appeals Council's Decision

After reviewing the entire record, the Appeals Council made the following findings:

1.    **The claimant's date last insured is December 31, 2011.**

2.    **The claimant did not engage in substantial gainful activity at any time after March 23, 2008.**

3.    **Beginning March 23, 2008, the claimant suffered from the severe impairments of status post-necrotizing fasciitis of the left leg and hypertension (20 CFR 404.1521(a)).  Beginning March 27, 2009, the claimant also suffered from the severe impairment of diabetic retinopathy.  Throughout the entire period at issue, the claimant did not have an impairment or combination of impairments which is listed in, or which is medically equal to an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.**

4.    **Prior to March 27, 2009, the claimant had the residual functional capacity to perform light work with occasional postural activities.  Beginning March 27, 2009, the claimant had the residual functional capacity to perform sedentary work with no small objects.**

5.    **For the period prior to March 27, 2009, the claimant was able to perform his past relevant work as an assistant manager of automotive parts sales (*see* Exhibit 4E, pp. 2 and 4).  Beginning March 27, 2009, the claimant was unable to perform his past relevant work as an assistant manager and a manager of automotive parts sales (Exhibit 4E).**

6.    **From March 23, 2008 through February 14, 2009, the claimant was an individual closely approaching advanced age.  Beginning February 15, 2009, the claimant became an individual of advanced age.**

7.    **The claimant has at least a high school education and is able to communicate in English.**

8.    **Beginning March 27, 2009, the claimant's acquired job skills do not transfer to other occupations within the claimant's residual functional capacity defined above.**

9.    **Beginning March 27, 2009, the claimant was disabled under the framework of Rule 201.06, Table No. 2 of 20 CFR Part 404, Subpart P,**

Appendix 2.

**10.      The claimant was not disabled prior to March 27, 2009.**

(R. at 7-8.)

*D.      Analysis of the Appeals Council's Decision*

**1.      The Appeals Council Properly Determined Plaintiff Did Not Meet the Required Duration Requirements**

When the administrative law judge and the Appeals Council disagree on award of disability benefits, courts owe deference to the Appeals Council. *Gross v. Heckler*, 785 F.2d 1163 (4th Cir. 1986). The statutorily-mandated deference runs in favor of the Secretary and the Appeals Council, not the ALJ and, the Appeals Council may reach conclusions differing from those of the ALJ, which must be upheld if supported by substantial evidence. *Parris v. Heckler*, 733 F.2d 324 (4th Cir. 1984).

Here, we have examined the Appeals Council's ruling under the substantive evidence standard and found that substantial evidence does support the ruling of the Appeals Council.

**a.  Plaintiff Did Not Suffer From A Visual Impairment Disability Prior To March 27, 2009**

Plaintiff's first assignment of error is that the Appeals Council's decision is erroneous because it is contrary to the medical record because the medical records themselves establish that Plaintiff suffered from a visual impairment prior to March 27, 2009.  (Pl.'s Mem. at 7.) Specifically, Plaintiff alleges a prior referral indicates Plaintiff was presumably suffering from symptoms of retinal detachment, diabetic macular edema, neovascularization and vitreous hemorrhage, at least one month prior to seeing Dr. Carter, whose diagnosis was the earliest documentation of Plaintiff's visual impairment.  (*Id.* at 7-8.)  The undersigned finds that the

Appeals Council correctly determined that these symptoms do not by themselves establish that Plaintiff had a visual impairment causing him to be disabled prior to March 27, 2009.

[An] impairment...must have lasted or must be expected to last for a continuous period of at least 12 months. 20 C.F.R. § 404.1509.   [This is called] the duration requirement.  (*Id.*)  A physical or mental impairment must be established by medical evidence "consisting of signs, symptoms, and laboratory findings, not only by [plaintiff's] statements." 20 C.F .R. §§ 404.1508, 1509.

The Appeals Council determined that although Plaintiff did receive medical treatment subsequent to a March 2008 spider bite, he did not establish that it caused an impairment that would preclude him from working.  (R. 5-9.)  Specifically, the Appeals Council concluded that the record contained no medical evidence of Plaintiff's visual impairment until March 27, 2009, the established onset date of disability.  (R. 6, 212.)  Although Plaintiff claims that symptoms affecting his eyes and vision caused by treatment for the March 2008 spider bite speak for themselves to establish an earlier onset date of disability, and uses other "subjective statements by the [Plaintiff]" regarding the cause of his March 27, 2009 diagnosis of retinopathy to demonstrate an earlier onset date, the Appeals Council's investigation found no medical support for these contentions.  (*Id.*); *see also* Pl.'s Mem. at 7.  The Appeals Council performed an extensive review of Plaintiff's entire record, particularly focusing on the time period between March 23, 2008 and March 27, 2009.  The undersigned believes there is substantial evidence to support the Appeals Council's finding that although Plaintiff had symptoms of visual impairment starting in 2008, he did not become disabled until March 27, 2009.

### b.  Plaintiff Did Not Suffer From Any Other Disability Prior To March 27, 2009

Plaintiff's next contention of error is that the Appeals Council's decision is erroneous because it is based upon an erroneous conclusion that the sole ground upon which the ALJ found Plaintiff disabled was his visual impairment. (Pl.'s Br.) Instead, Plaintiff argues that he also suffered from post-necrotizing fasciitis of his left leg, and that caused him to be disabled as of March 23, 2008. (*Id*.) The undersigned finds that the Appeals Council correctly determined that Plaintiff's left leg impairment was not disabling prior to March 27, 2009.

Pain is not disabling *per se*, and subjective evidence of pain cannot take precedence over objective medical evidence of lack thereof in determining whether claimant is entitled to disability benefits. *Parris*, 733 F.2d at 326.

The Appeals Council analyzed Plaintiff's leg impairments specifically for the period from March 23, 2008 to March 27, 2009. (R. 6.) The Appeals Council analyzed the record and found no "evidence of treatment or any indication [Plaintiff's] functional capacity with respect to his left leg impairment from July 2008 until a July 2010 consultative examination". (R. 5-6.) The Appeals Council also listened to Plaintiff's testimony and found that as of December 2011, he reported that he "got around fairly well on his left leg". (R at 6.) As a result, the Appeals Council found that prior to March 27, 2009, Plaintiff suffered from post-necrotizing fasciitis of the left leg and hypertension, but the Council specifically determined Plaintiff was capable of performing his past relevant work as assistant manager of automotive parts sales and therefore not disabled. (*Id*.) The undersigned believes there is substantial evidence to support the Appeals Council's finding that although Plaintiff did have pain and treatment for necrotizing fasciitis in his left leg, medical evidence does not prove there was a disability prior to March 27, 2009.

## VI.   RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's applications for disability insurance benefits and supplemental security income is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 11) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 12) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all parties who appear *pro se* and all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 27th day of September, 2012.

DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE